Patrick Naughton and Helen O'Sullivan May it please the Court. My name is Alexandra Shapiro and I represent Appellant Donal O'Sullivan. This is an unusual case in which the government has essentially turned a civil contract dispute between Mr. O'Sullivan's construction company and various unions into a criminal prosecution. The principal question on Mr. O'Sullivan's appeal is whether there was sufficient proof that he had criminal intent which was required for each of the charges. The government had to prove that Mr. O'Sullivan understood that various workers were doing work that was covered by the collective bargaining agreements and that he knew that the company was using Allied to avoid paying union benefits for that work. How long had Mr. O'Sullivan been in this business? I don't know exactly, Your Honor, but... A very long time, right? A long time. And he was himself a member of the union, or had been at least, but I think he was still a member of the union. That's correct, Your Honor. So he was pretty familiar with what the union contracts are, right? Well, he did not negotiate these contracts and as we've explained... He lived with these contracts presumably at one time as a worker and then as an owner of a construction company for many years, right? That's true, Your Honor. And it was his responsibility under the contracts to comply with various requirements, not just about the payment of benefits, but about what work was and wasn't union work, right? I'm not sure what you mean. Sorry. Well, are you suggesting that he did not know the difference between union work and non-union work? Is that what there's... No, Your Honor. Excuse me. Is there lacking proof from which a reasonable jury could conclude that Mr. O'Sullivan understood what tasks his employees were doing that fell within the union contract and what other work they might be doing that did not? The argument is principally that it's twofold. But as to what the workers were doing, there was no evidence that he knew what any of the particular workers who were being paid by Allied were doing in connection with the work for which they were paid by Allied. So he did not know what... The issue isn't that he didn't know. If he knew what a given worker was doing, you're not arguing that he didn't know that that work was or was not union work. You're arguing he just didn't know what any of these people were up to. Well, it's both, but it's principally the latter. So the point is principally the latter, but it is both. I think we've detailed in the briefs that these CBAs were incredibly... And that includes the undocumented worker with whom he had a particular conversation where the worker asked about getting in the union, and he said, well, get a green card, and then we'll see about it. That's correct, Your Honor. There's no evidence... The guy who had worked at his house before he hired him to work for the company, and he doesn't know what kind of work that man does for his company. And the jury could not infer that he understood what that man did as his employee. Well, Your Honor, even if the jury could have inferred that, the evidence showed that what that individual, Mr. Gonzalez, did was principally yard work and noncover work. So now we're back to the argument that what he really didn't know was whether it was covered work or not covered work. Well, Your Honor, we're making both arguments, but I will – I would like to push back a little bit on what Your Honor is suggesting, because what the evidence showed was that Mr. Gonzalez, before he was hired by Nablus, worked in Mr. O'Sullivan's home. That's totally separate from this – the issue... But presumably Mr. O'Sullivan then becomes familiar with the kind of skills that the man has and chooses to employ him to exercise those skills for his company. I would think that suggests that he knows what Mr. Gonzalez is capable of doing and not capable of doing and what he is likely to be assigned to do when working for his company. And that's just one guide. That's correct, Your Honor. You're suggesting that everybody whose payroll is farmed out to Allied under a system in which Allied is created for the very purpose of looking like it's a subcontractor, right? They have to get insurance. There's no reason why Allied needed to have the kind of insurance that it got if it's not a contractor but is just processing payroll. Isn't that right? Well, Your Honor, I think what the evidence showed, based on Mr. Lamb's own testimony, was that the reason Allied was set up was that Mr. Lamb needed a way to get more work so he could stay in the country. Yeah, so maybe Mr. Lamb understood that it was only a kind of scam on the immigration authorities. That's what his interest was in doing it. He's not an expert in the construction business and the labor contracts. What his intent or his belief or his thoughts are in this matter seem to me entirely irrelevant. The question is what the various people charged with the conspiracy knew or did not know. Is that not right? That's correct, Your Honor. It is not necessary for the government to prove that Mr. Lamb understood that this was a scam on the unions, right? Well, I disagree, Your Honor, because the government claimed that Mr. Lamb was part of this conspiracy and that he was – they said that he was going to testify. Does the jury have to find that Mr. Lamb had a guilty frame of mind, understood the nature of the scheme in order to convict Mr. and Ms. O'Sullivan and Mr. Norton? Well – Yes or no? The answer is no, right? They do not have to find that. No, but, Your Honor, there's no reasonable inference based on the evidence, including, most importantly, Mr. Lamb's testimony from which the jury could have inferred that. And the jury had to believe that testimony when Mr. Lamb puts masonry down on his invoices? Well, Mr. Lamb testified that he did that of his own accord and, in fact, there was no evidence suggesting – when he said he did not understand what the goal of the conspiracy was. In other words, Mr. Lamb is just a red herring. Well, I don't – Mr. Lamb's frame of mind has nothing to do with this case, does it? Your Honor, I disagree with that. I'm sorry. Respectfully, I disagree with that. I think that there – that no reasonable jury could draw the inference from Mr. Lamb's testimony. He was the government's principal witness here. And there really was – if you look at the evidence from the workers in the case, they largely testified that they were either doing non-covered work or the three ones who eventually joined unions when they – the vast majority of the work for which they were paid by Allied, which was only a fraction, was non-covered work. And then, for instance, one of them, when he joined a union, he stopped being paid by Allied. He was then paid by Navalis. If you actually look at the workers' testimony, what you'll see is that very little of what they were doing was covered work. And, again, I know Your Honor may disagree. Well, the part that I'm struggling with is that we seem to be having a discussion over competing inferences, but you're not disagreeing that we have to draw inferences in the government's favor here. Well, I think it's a little more nuanced than that. That is true, but they have to be reasonable inferences. And under Jackson v. Virginia, as well as the long line of cases from this Court, that speculative inferences or inferences that are outweighed by inferences of innocence do not amount to reasonable doubt by a reasonable jury. And that's what we're relying on. And I think the most analogous case that we've cited is the Lorenzo case. In that case, the Court held that there was evidence insufficient to show that two of the defendants had knowingly participated in a drug conspiracy, even though there was evidence that the circumstances were suspicious and could be indicative of participation in illegal behavior, but not the behavior that was charged. You know, the Court said that in here, what we have is evidence that Mr. O'Sullivan may have knowingly participated in violations or thought that there might be an issue with the immigration laws, but what the government has improved is that he deliberately set out to use Allied to avoid paying union benefits. And it's an equally reasonable inference that he was willing to engage in potentially criminal behavior vis-a-vis the immigration authorities just to help out Mr. Lamb. That is an equally reasonable inference to the inference that he was engaging in this behavior, like the behavior that he engaged in in the related scheme for the purpose of taking some of the people out of the union benefit structure. Well, Your Honor, we obviously disagree with that. And with respect to the latter, I see my time is up. But we also believe that for the reasons set forth in the brief, that that evidence was inadmissible and shouldn't have been allowed in under Rule 404B. All right, thank you. You've got some rebuttal time. All right. Mr. Marmer? Good morning, Your Honors, and may it please the Court. My name is Nathaniel Marmer, and I represent the defendant, Patrick Naughton, on this appeal. Your Honor, our first position is that the evidence was insufficient to show that Mr. Naughton had the criminal intent to commit the violation here. I'm sorry, I need you to speak either louder or closer to the mic. I'm so struggling to hear you. I apologize, Your Honor, that he did not have the criminal intent to join a conspiracy to deprive unions of their benefit funds. And I want to make clear that Mr. Naughton was not an owner, a shareholder, an officer, or director of this company. He was an employee. His salary was not in any way tied to the success or failure of the alleged scheme. He had no bonus and no job security based on that. He was given an assignment. The assignment was very early on to help Mr. Lamb establish Allied, and he did that. In thinking about Mr. Naughton's role in this, one of the things that puzzled me, and maybe you can help me with this, is why, if this was not a scheme designed to hide things from the union, why wouldn't Mr. Naughton disclose to the union folks the books and records of Allied, the books and records of Navalis that related to the Allied payroll? Why does that not happen? Because if it's all open and above board vis-à-vis the union, the union would be entitled to see all the payroll records and make its own decision and then negotiate or sue or do whatever they thought was appropriate, and the whole problem could be sorted out. But if nothing is told to the union about a number of workers who, whatever their status, whatever the work they're doing, whether they're union members or not, are clearly employed by Navalis, regardless of the fact that their payroll is processed by this very interesting double scheme where instead of paying $100 to ADP to do the payroll work, they're paying thousands of dollars to Mr. Lamb to basically turn the information over to ADP and pay them $100 to do it. If that's all so innocent, why don't those records get disclosed to the union? And Mr. Naughton was one of the people who was supposed to deliver them, right? It was one of his responsibilities. So to speak. But Mr. Naughton, he did provide the general ledgers and the cash disbursement journals. We appreciate as a matter of magnitude that there are hundreds if not thousands of employees of Navalis whose salaries that were disclosed, their compensation was disclosed for review by the unions for benefits. Sure, there are a lot of banks that the accused bank robber didn't rob that he could have. The issue is the allied workers, unlike the workers who are on the official Navalis payroll, right? The people who are on the payroll get disclosed to the union. The only thing that's disclosed about allied is the same thing presumably that would be disclosed about any of the list of subcontractors that Navalis may have dealt with, that one of our expenses, some of our expenses involve paying other companies and one of them is allied. That's not the same thing as talking about here are workers who work for Navalis, but don't worry about those unions because they're not doing union work. Why is that not said to anyone? I appreciate the question. My point was not the – I walked by the bank and I – No, I know. – committed good acts and therefore – But I guess you're just saying there's lots of records and this was just overlooked. That's, I think, a fair way to state that. And I do want to point out, and I know it's clear in our brief, the number of workers on the Navalis payroll was very, very small. At times we had four or five workers, some of them who worked only a few hours. And so the magnitude was really my point of the disclosure versus what the undisclosure was. I guess this doesn't really go so much to Mr. Norton, who, as you say, is probably not terribly worried about the profit and loss, though I guess anyone who's a high-level executive of a company cares if they're going bankrupt or not. But other than that, but isn't it also the case that while there are – this is a relatively small amount of money compared to what they did pay to the union. Yes. Certainly that's clear. The amount that was saved in some years could be the difference between profit and loss for the company, right? I understand how the government crunches the numbers to get to that fine line. They don't crunch very hard. I mean, I just read in the newspapers about Macy's having this $154 million error in its delivery costs. It's like a rounding error compared to the total amount of the delivery costs, but it's actually enough to make the difference, given the thin profit margins, between a good year and a bad year. And I appreciate, Your Honor, that that can, in a particular year, that number can make a difference. But in terms of the scope of union benefits paid versus what was supposedly avoided – and if I could just sort of follow up. I know the Court doesn't make points, but your line of questioning, if you will, about whether what was covered or was not covered was relevant to Mr. Naughton. He is not a union member. I don't believe there's evidence that he's a union member. He didn't negotiate the CBAs. He's not aware of what the CBAs say. He doesn't see what the workers are doing. He doesn't know if their work is covered or not. That's not his area in the company. His area is he's not involved with payroll. He negotiates insurance for the company. Well, you certainly have some evidence on your side, but at the bottom we have testimony from Lamb that your client instructed him to set up allied to process payments, and he provided a weekly list of people paid through and inquired about their W-2s. Why isn't that enough for an inference when there are competing inferences and we have to view everything in the government's favor? Well, there is some very early on. He did help establish allied as he was directed to, and he did that. But there's no evidence that he continued in any way to facilitate the scheme in any sort. And in terms of competing inferences, here there's at least a strong, if not stronger, inference that from Mr. Norton's perspective, I'm not saying he knew of any immigration fraud, but Mr. Lamb testified that the purpose of this was to help him get a visa so he could stay in the country. Well, that's why he does it, but that's why the 404B evidence is so significant in this case, right? Because that's not all that's going on. In other words, it could be that the favor to Lamb is to cut him in in a way that's pretty much unnecessary because there are other ways to do the same scam, and actually the company is doing some of those other ways of doing the same scam on the union. So, yeah, it's a favor to Lamb that gets Lamb involved, and I guess no good deed or no immigration fraud deed goes unpunished because that's what leads to the unraveling of this, is that Mr. Lamb, well, I guess it's one of the things, the union is on him for the other stuff, too. But, I mean, it's sort of Lamb becomes the cooperator because he's got the immigration problem, and maybe it was pretty dumb to put a guy in this position where he might be jammed up. But I just don't see why the fact that it's a favor to Lamb is all that helpful. It's not a favor to Lamb to set up a payroll system that, in fact, hides certain employees' existence from the union. If I may make two responses to that, Your Honor. First, it's not a question of a favor to Lamb for Mr. Norton. Mr. Norton is an employee of this company who is directed to help somebody for whatever reason set up this company, and that's what he does. He's a functionary in this regard. The second point is, and you mentioned the double-breasting scheme, which is the related civil case, and I do want to use that as a jumping-off point to our point two, which is that Mr. Norton was not involved in that. There's no evidence whatsoever of his relationship or connection to that. And so, in fact, the government— So that doesn't go to his intent or— It doesn't go to his intent. So that's an evidentiary issue, so the remedy, of course, would be different. We appreciate that. But in looking at the totality, it's important to see that the government continuously, repeatedly said this was done to line their pockets, and including on the double-breasting scheme, that this is what their sort of, you know, M.O. was, so to speak. Was there any instruction sought or given about how the 404B evidence related to Mr. Norton? I believe there were—I wish I could have a more precise answer to that question. I know there was a general objection to it. There was a—well, more than a general. There was a fair— Well, there's a lot of— There was a lot of— —questioning over whether this comes in. Yes. But the argument you're making now, which I think is an interesting one, is that— I— —whatever this says about Mr. O'Sullivan's motive and intent may not be the same effect as to Mr. Norton. I don't want to answer the question and give a wrong answer that's not faithful to the record, Your Honor. I do believe that in the discourse that that issue did come up and the point was certainly made and that the government in their rebuttal summation lumped him in and said, you know, he's the one making money. And if you look even at their brief in terms of the 404B evidence, they don't mention Mr. Norton at all because he had no role in this. And so to the extent that there are competing inferences, and I take the point, we still believe that those competing inferences warrant a reversal here. But it should be looked at in that context of the spillover prejudice from the evidentiary point. I understand. All right. Thank you. May it please the Court, John Klein for Helen O'Sullivan. And I'd like to reserve two minutes for rebuttal. Ms. O'Sullivan has made a sufficiency argument. I join my colleague's comments. But what I'd like to focus on today, of course I'll answer the Court's questions, but I'd like to focus on the conscious avoidance instruction. The conscious avoidance doctrine crept into the law decades ago. It was originally a doctrine that was supposed to be exercised rarely with great caution. And, of course, it is now commonplace in any case where knowledge is disputed. This case didn't exactly creep into the law. I mean, it's in the model penal code. It's a fairly standard aspect of criminal law as we now understand it, right, because in a certain sense the conscious avoidance instruction just says that a defendant can't say, I looked at it, it looked like marijuana, it smelled like marijuana, but how do I know that it's really marijuana? I mean, no one told me it was marijuana. I didn't do a field test on it. So what? How can I be held to have known? And the answer is if you know so much that any reasonable person is going to infer that and you don't do anything further to clarify your state of knowledge, you know. It's the equivalent of knowledge. That's the theory of conscious avoidance. And, in fact, in cases like Jewell, which was one of the original conscious avoidance cases from the Ninth Circuit to which then-Judge Kennedy dissented, that was the fact pattern, and that was typically the fact pattern where the doctrine was applied. What has happened, as happened with so many doctrines of that kind, is it's now spread to the point where it is routine in any case where knowledge is disputed. But what I'm wondering, you see, is if there is sufficient evidence from which a jury could conclude that someone actually knew something, but it's inferential knowledge, isn't it a fortiori that there's sufficient evidence to show that that person was sufficiently aware of all these facts that the jury should assess, whether this was a case of deliberately avoiding that final step of finding out? If there is sufficient evidence of actual knowledge, and, of course, my position is there was not. Yeah, but so that's really what the ballgame is, isn't it? No. That there's not sufficient evidence to show either of these things. There is not sufficient evidence of a culpable state of mind, whether you describe it as conscious avoidance or you describe it as actual knowledge. There's not enough evidence that Ms. O'Sullivan understood anything about what this scheme was about. She's a functionary in this, sort of like Mr. Norton's argument, only maybe even more so. Except for the family connection, she is functioning as a kind of bookkeeper in this, right? I mean, that's what the argument really is, isn't it? That is certainly the argument on actual knowledge. I totally agree with you, and I think her conviction should be reversed for that reason. And why isn't that really the same issue with respect to conscious avoidance? She either did or didn't know enough. Because, Your Honor, there are two prongs to conscious avoidance. The first is knowledge of a high probability that some criminality is going on, and that goes to the point Your Honor was just making. But the second prong, which is the one that the district court focused on and most of the discussion below focused on, is, did she make, is there evidence, any evidence whatsoever that she made a conscious decision, took deliberate actions, to use the global tech formulation, to avoid knowledge? So it's not enough just to know that there's a high probability that something culpable is going on. You have to also take deliberate actions or make a conscious choice to avoid learning the fact. And the purpose, there are cases that say the purpose of deliberately avoiding knowledge has to be so you can deny later that you knew it. There's just no evidence of that. The evidence that the district court relied on, the evidence the government relied on, is an assumption. It's not even evidence. It's an assumption that Ms. O'Sullivan didn't ask any questions. There's no evidence of that. There's no evidence one way or the other. For all the record shows, she could have asked plenty of people, hey, do these people do covered work, and been told no. Or it's possible she didn't ask any questions at all. But if on a silent record it's permissible to infer that no questions were asked and then to infer from that assumption that there was a deliberate choice not to learn information, then the conscious avoidance instruction can be given in every case. Okay, but isn't it all immaterial if we find that there was overwhelming evidence of actual knowledge? Because then wouldn't it be harmless even if there was an error? If there were overwhelming knowledge that Ms. O'Sullivan had actual knowledge, then, yes, that would be harmless. I think we still are getting back to the question that Judge Lynch suggested was like the whole ball of wax, like, you know, is there enough evidence to show that she actually knew what was going on? Unless you can tell me that there's some way to quantify what overwhelming evidence means. Well, for example, in the Kaiser case, which we cite in our brief, 690F3rd something, I forget the page number, there was in that case it was a faulty conscious avoidance instruction rather than one unsupported by evidence. But the court found that there was not overwhelming evidence. Why? Because there were competing inferences that could be drawn on both sides because there was a cooperator who wasn't terribly reliable. There was enough evidence to support the conviction, but it wasn't overwhelming. Certainly, as— Yeah, apart from the question of overwhelming or not, I guess we just have to make or use our best judgment about that. But I'd just like to inquire about one piece of the evidence that struck me that I don't really understand. Why—what possible explanation could be offered to a jury to reconcile the fact that Ms. O'Sullivan winds up paying these people out of her own pocket? Not to her economic detriment. She's reimbursed. But what is the—if there's not knowledge that it is somehow important to keep these people off the navalist payroll, bookkeepers don't usually find themselves in the position of writing checks from their personal checking account to company employees and then getting paid back by the company instantly. We're not talking here about a need to—she's making a loan to the company or anything like that. It's just the money is channeled through her. What am I to imagine, if I'm a juror, that she could possibly have thought other than that there is at least something that requires keeping these people's existence as navalist employees secret? And let me describe—I'll answer your question, but it's a longer answer than you might have— It probably is. Okay. It's like my students ask me. I just have a quick question. I say something, but it's not necessarily a quick answer. First of all, all these people ended up on the navalist payroll within a matter of months. But what happened is Allied quit without any notice right before Christmas. And the question was, how are these people going to get paid? And Ms. O'Sullivan stepped into the breach and paid them. And that practice lasted for a couple of months. Why couldn't they be—the fellows explained, Christmas or no, why can't they just be put on the payroll? I mean, after all, she's doing, through this entire operation of this charge, she's doing exactly the work that she would have to do to put them on the payroll. She's not saving any effort. She's, in fact, having some extra effort because whenever an employee's status changes or they change their W-4 or whatever else is going on, she has to do the same things she would do if they were on the navalist payroll, only instead of just entering it in the books, she ships it over to Mr. Lamb. If, again, if this is innocent appearing to everyone involved, including Mr. Norton, including Ms. O'Sullivan, what do they think is going on? What is the great obstacle in the pre-Christmas period to just putting them on the payroll? They have all the information that's necessary to put them on the payroll. And the short answer is there is nothing in the record to answer that question. Now, I can speculate. It's right before Christmas. People are probably out of town. It may be difficult to accomplish the transition and get them on the payroll. The idea might have been to put them on the payroll. It's not your burden to prove what really did happen, but I'm looking at this from the perspective of a juror and asking what do I infer about these people's knowledge from their various activities and if their activities are inexplicable, essentially, other than by an inference that they understand that these employees are being hidden. And who are they being hidden from? They're not being hidden from the IRS. They're being hidden in this business, in this kind of business. Who are they being hidden from, if not the unions? And I think that's a perfectly fair question for a juror to wonder about. Right. But it's not just to wonder about. It's here we see all this stuff going on. And the question is, like always, the state of a person's mind is judged by what they do, by the circumstances, by circumstantial evidence. And so we look at what they're doing and we say, what is the only possible explanation of this? And I guess my point is, in the absence of evidence on this point, that is not the only possible explanation. But that's not the standard, right? Isn't the standard that they need to find that no rational trier of fact would have viewed that as improper enough to commit? Right? I mean, I feel like you're turning it on its head for where we are right now. So a two-part answer to that. Part number one is that would go to sufficiency of the evidence, although I disagree that it is a permissible inference or a strong enough inference to support the conviction. It does not amount to overwhelming evidence, which is what you would need to find the improper conscious avoidance of something. What overwhelming evidence looks like? Overwhelming evidence. What are the words that we write down as to what overwhelming evidence means? Overwhelming evidence to me means that no reasonable person could possibly come out the other way. So it's not a question of whether there are competing inferences that could be drawn. And we give a lot of deference to the jury. And so it's permissible. It has to be so strong that there is no gloss that I know of from this court. So this is me sort of making it up as I go along. But I think it has to be so strong that really there's no possibility that if you reverse the case and it were tried again, there'd be an acquittal. Of course, then the problem going back to the conscious avoidance instruction and the evidence that supports that, isn't it the same? Putting aside whether if there should not have been a conscious avoidance instruction, what would be overwhelming evidence of knowledge? Isn't the same evidence that is sufficient to establish knowledge sufficient to establish in the minds of a reasonable juror that this is a person who says, I'm just following orders. I don't ask any questions. Not my job to ask questions. I'm not getting involved beyond I do what I'm told. And is that not the definition of conscious avoidance? I do not think the evidence is sufficient. If the evidence of knowledge is sufficient to show actual knowledge, it's probably also going to be sufficient to show awareness of a high probability that bad things are happening. It is not sufficient, in my view, to establish the second requirement. Isn't the second requirement just what I just said? I'm not going to ask any questions. I don't question my boss. Something bad's going on here. But I'm protected because I don't actually know. Isn't that what conscious avoidance is? That is what conscious avoidance is. But that's not enough evidence to infer that that was, first of all, there's no evidence here that she did or didn't ask questions. So your question sort of buys into the assumption that she didn't ask questions. And there's no evidence of that. Well, isn't that the reasonable inference? If she asked questions, what would have happened? I mean, that's the, you know, this is, we're talking about, like, the real world here. And jurors, jurors are people who know about the real world. That's their function. And one of the things that they are likely to think in a situation like this, the inference that they are likely to draw, is if this person started asking questions, maybe she'd get fired. Well, she's his sister, so maybe she just gets transferred to some other responsibility. But if she starts asking questions, this thing stops happening. And, therefore, it must be that she didn't ask questions. That's a reasonable thing for a juror to think, isn't it? I don't think so. Okay. I don't think so. And if she had asked questions, she may very well have been told, the work isn't covered, so don't worry about it. That's really what I think a juror could fairly have inferred from, if a juror concluded that she didn't ask questions, for which there was no evidence, I think a jury could reasonably infer that the answer would have been, don't worry about it. It's not covered work. My time is up. Any other? All right. Thank you. Yes, you've got some rebuttal. Thank you. Good morning, Your Honors, and may it please the Court. My name is Turner Buford, and along with my colleague, Meredith Arfro, we represent the United States on this appeal, as well as in the proceedings before the District Court. The principal challenge raised by each of the defendants in this appeal is the sufficiency of the evidence underlying their convictions, which arose from the scheme to hide payroll information from union benefits funds over the course of multiple years to avoid making financial contributions to those funds. For the reasons stated in our brief, and in the District Court's opinion, denying the defendants' motions under Rules 29 and 33 of the Rules of Criminal Procedure, the evidence was more than sufficient to uphold all of their convictions. In addition, could you focus on what I think is Ms. Shapiro's principal argument, that Donald O'Sullivan is at the head of a very large operation. There are at least hundreds of employees working for him at any given time. So from what could we conclude that he understood what work each of these people was doing at any given time? Well, I think you can infer that from the fact that he initiated this payroll scheme. He's the one that asked or figured out that Mr. Lamb was in a bind and was looking for work. It's clear from the chronology of events that he instructed Mr. Naughton to set this up in the first instance. It's also clear that he's aware of it, and the email that he sends a few months after it begins, he advises Mr. Lamb that the weekly arrangement that he has with Mr. Lamb will continue. But it would have all been legitimate if there was a strict separation between employees doing union work and employees doing non-union work. Wouldn't that be right? I disagree a little bit, Your Honor, which is to say that even if there was this strict segregation between employers doing covered or non-covered work, that would not eliminate the contractual obligation for Nautilus to provide all of the payroll to the unions because the unions are entitled to even the payroll for non-covered work. And this is something that's in our appendix and in our brief, but the unions get the entire Nautilus payroll, which indisputably includes employees who are not union members and who are indisputably not doing covered work, Padraig Naughton and Helen O'Sullivan being only the most prominent examples. They're entitled to examine the entire payroll. That's supposed to sound like a right-to-control theory. Well, it's fraudulently concealing the asset itself, in this case the right to enforce the contract. That's the theory that this Court endorsed in LaBarbera, which was carefully read into the end. There is a different statute here. The 664 charge does seem to cover things that are not in Section 641 about theft of government property or in the mail-and-wire fraud statutes that talk about obtaining money or property. I think that's right. It explicitly uses the term conversion. If it used the term conversion, it used the terms assets and credits, which certainly look a little different than tangible property anyway. I agree. But the principal charge here is not so technical. The principal charge here is that they were actually scamming the union out of money that it was entitled to. That's really what the guts of this case is about. That's correct, Your Honor. And to go back to Mr. O'Sullivan, he's also funding this payroll. He's the one writing, along with Helen O'Sullivan, the checks that go out to Allied that cover it. And these are large figures. This is more than just a payroll processing fee, meaning that the jury could infer, Mr. O'Sullivan was aware, that they were providing not just a processing fee but the actual compensation that would then go to the workers. Right. And the whole thing is set up, and Mr. Norton is involved integrally in setting it up, to have this not function like payroll processing. Allied is not doing ADP's work. It's just a sham set up, a scrim set up in between Nablus and ADP. I think that's right, Your Honor. And I think that the jury is entitled to infer that the obvious result of a particular process is the intended result of that process. And here, in our view, the obvious result is that these workers are hidden from the union and who never get the payroll itself. And if they were to look at the invoices, why is Nablus paying Allied would see only masonry at first or consulting, which is the specific suggestion of Mr. Lamb, who is the one responsible for providing those invoices or the general ledger to the unions. Not Mr. Lamb, Mr. Norton, I apologize. So to a question that was raised earlier, too, in addition to funding the payroll with those large amounts of compensation, Mr. O'Sullivan has had this company for a long time. He's been in this industry for a long time. He has to know that the workers that are being paid to do the various Nablus work, there's a high probability that they are doing work that's covered by one of the many collective bargaining agreements to which Nablus is a signatory. And he's personally familiar with one of those workers, Luis Gonzalez, whom he knows because he did work on his house. And Mr. Gonzalez complained a lot to him about it. And Mr. Gonzalez said, why am I getting paid by a company that's not Nablus? And also, would you please help me join a union because I would like to get the benefits. And ultimately nothing comes of that. But Mr. O'Sullivan, I think it's fair for the jury to infer, understood that there was at least at a minimum, absolute minimum, a high probability that Mr. Gonzalez and the other workers being funded for this were doing work that would trip their obligations under the collective bargaining agreements to make compensation. Mr. Shapiro suggested also that in fact, not just as a question of Mr. O'Sullivan's knowledge or intent, in fact, a lot of what the workers on the Allied payroll were doing is not covered work. Is that conceded? Is that a fact? Or is that – there's evidence that that might be the case. But is that something that the jury would be required to find? Did the government contest that they were doing two types of work? No. It is certainly true, I think, that some of the witnesses who testified at trial described doing work that would not be covered under a collective bargaining agreement. That is true. The majority – all of the witnesses testified, though, that they did work that would be covered under a collective bargaining agreement and for significant chunks of time. Vincent LaPenta talked about how he would work at high rises, preparing materials for the bricklayers and then cleaning up after that. That's core mason tender work. Similarly, Gregory Kelly talked about doing core cement and concrete worker work at various high rises. And you have witnesses like Michael Hope and Julio Pomponio, who are actually union members, talking about doing the kind of work that they would do for their unions for Navalis. And somehow the word got down to these workers that when the shop steward came around, they had to hide or lie. Well, exactly, Your Honor. The shop steward process is not foolproof. Vincent LaPenta – Well, it could be highly corrupt, but that's not what this case is about. What the witnesses testified to was either they lied or they hid or they somehow acknowledged something, but the guy went away. I think that's right, Your Honor. I think the jury could infer that this was a sort of private, small workforce that could be deployed here or there in a nimble way when costs were overrunning to save money at the margins in a material way to help the company. That was the purpose of having this payroll. I think it's fair to conclude. And while it may be true that not all of the workers did covered work at every single moment of every single day, certainly the evidence at trial was that they were doing it in significant portions of their day-to-day, and that would trigger the obligation. It also goes back to the earlier point I made, which is if you want to dispute whether it's covered or not, there's a process for that. You turn over the payroll and you point to a particular worker and say, this person actually wasn't doing covered work. And the evidence showed that Mr. Naughton participated in that very process at various times, offering an affidavit from an employee, in one instance, that the employee was overseas and therefore couldn't have been doing work at this time that the union claimed it. So there is a process you can go through. But the evidence here was that they fraudulently avoided that process by concealing this payroll and making it look like it was an arrangement other than what it really was. I would also add, Your Honor, on Mr. O'Sullivan, he testified in a civil deposition that was offered at trial. And the defendants, both at trial and here, have suggested that the jury could have found this was the non-union payroll, this kind of bespoke, unique arrangement that Navalis, which has its own in-house payroll department, created for this specific purpose. Yet all of those innocent explanations that were suggested at trial and offered on appeal are ones that Mr. O'Sullivan declined to give in the deposition. Right. He said he never heard of that one. And doesn't believe that Navalis ever used an outside payroll processing place, which, again, if this were all on the up-and-up, I think the argument at closing was— And he's writing hundreds of thousands of dollars worth of checks to Allied for payroll. And having Luis Gonzalez's W-2 delivered to his home residence in the name of his brother-in-law. It says Allied. So, again, to disclaim knowledge of the Allied payroll in that situation, I think further supports the inference that he well knew what its purpose was and was trying to hide his involvement with it. And that goes to the fact patterns that are discussed in the conscious avoidance cases, where you have somebody who is sort of deliberately delegating to co-conspirators or employees the dirty work, so to speak, so they can stay above the fray. And I think the evidence warrants the conscious avoidance instruction for Mr. O'Sullivan and for the other defendants as well when they're placed on notice of a number of highly suspicious facts that, in our view, would permit the jury to infer actual knowledge, but certainly supports the conclusion that they deliberately avoided connecting all of the dots so that they could maintain plausible deniability. So how do we avoid a situation in which the jury instructions inducing the jury to find the defendants guilty based on negligence or recklessness theory? Where's the line between negligence or recklessness and the conscious avoidance? Well, I think it's spelled out in the actual instruction that was given, where the court specifically says it's not enough if you find that they were sort of careless or negligent in making mistakes in the course of conduct that occurred here. You have to find that they were on notice of these highly suspicious facts and then deliberately avoided the logical conclusion of those facts so that they were, to the question that was raised earlier, you can conclude they have actual knowledge of what happened here. They knew facts A through however many, and a reasonable person would have concluded that that means you know what was going on. But what's the element of if we accept the fact that your adversary brought up that there's no, you know, we can't assume that she didn't ask questions. I mean that's, I guess, a potential inference floating around out there, but there's no evidence as to whether Helen McLaughlin asked questions or not. And so what's the part that fulfills the sort of deliberate, sort of the second part, if you will, of there's these highly questionable circumstances and then you did X or didn't do X? Where's that component? Well, first of all, I think the case law is clear that we can, you can merit the conscious avoidance instructions on the basis of circumstantial evidence. And so here, Helen O'Sullivan is the one who writes the certifications that go with the remittance statements to all of the unions for which NAVALIS does make contributions. So she's certifying over and over again, here is the payroll that we have reviewed, here are the hours that are covered by your collective bargaining agreement, here is our check for the contributions that are made. She never, not once, makes any contribution to any union for any employee on the allied payroll. Given the testimony at trial that the workers were doing covered work, given her knowledge of the payroll sheets where the employees on the allied payroll are specifically classified as performing trades that would facially implicate these collective bargaining agreements, carpenter, bricklayer, laborer, the jury could infer that she did not scrub the allied payroll through the same process that was used to generate the union contributions that were made for the NAVALIS payroll. And in our view, that would constitute the deliberate failure to not ask questions. If you just don't draw the obvious conclusion that is in front of your eyes, that's conscious avoidance. I think to say didn't ask questions doesn't imply that there have to be questions that officially did not get asked. It's what is the possible explanation for not knowing? I think that's right, Your Honor. What's the, though, I guess the fact that the evidence that you relay all could certainly support conclusion of knowledge, of actual knowledge or what have you. I guess I'm just wondering what is the thing that made a conscious avoidance charge, I don't want to say necessary, but it's like you have all this information and so we want the jury to say, look, you can infer that she had knowledge because she did this, she did that. But it doesn't feel like sort of the classic situation of conscious avoidance where there's this specific scenario that we want to say the defendant was avoiding. Well, I disagree, Your Honor. I think that what the conscious avoidance instruction advises the jury is appropriately, the government can establish knowledge even if they don't have a witness saying Helena Sullivan was at a particular job site watching the workers do covered work. She's presented with all of these suspicious circumstances and she resists making the logical conclusion. And this is triggered in some part, I think, by the arguments the defense make at trial. Like, how do you know that she didn't know? Maybe she was asked and, you know, was advised. I mean, certainly circumstantial evidence, though, can be considered for establishing knowledge. And the jury, regardless of this instruction, would have been, I assume, was told Well, they would have been told that, you know, you can rely on direct evidence of knowledge. You can rely on circumstantial evidence of knowledge. So that's not, there's not some gap that the jury needed to have filled. There has to be an inference is the point. And the conscious avoidance instruction reminds the jury that there's a way in which people can pretend not to know. And that's a situation where you can conclude that they did know. And conscious avoidance is just another way of proving knowledge. I agree. What knowledge means is if I know all these things and I just do not, resolutely do not draw the conclusion that all these things would lead a reasonable person to believe, that's a deliberate choice. Now, that's what the jury has to find. And recklessness is just being aware of a significant risk that something is wrong, as opposed to being aware of facts that make it highly probable that it is wrong. I think that's right. And I don't think the defendants are prejudiced when, again, the jury is instructed as part of the conscious avoidance instruction that negligence, carelessness isn't enough. And we're instructed later in the instructions that good faith is a defense. If they believe that these were accidents or mistakes, they could not have found the defendants guilty on that basis. It's a thin line between knowledge and conscious avoidance. It's a thin line between conscious avoidance and recklessness. It's a thin line between recklessness and negligence because, after all, a reckless person is someone who effectively knows he's being negligent or understands what the risks are and says, I'll go ahead anyway. And how do you prove that? Usually by proving that it's so negligent that the person must have known. Any idiot would have known means it's negligent. Any idiot would have known, and this person is not an idiot, so he must have known is the inference of recklessness. And these are all a sort of sliding scale of different types of culpable mental states. So at any given point, there's line-drawing issues, and the line-drawing is for a properly instructed jury to say where on this they fall, and here they may have fallen on the actual knowledge side or they may have fallen on the conscious avoidance side. I agree, Your Honor. Okay. Can you tell me or tell us how we should be thinking about the relationship between Halpin and LaBarbera? Does Halpin reinterpret? Does it implicitly overrule? Can they be neatly harmonized? We think Halpin reinforces LaBarbera. So LaBarbera holds that a defendant can be guilty of aiding and abetting a 664 violation by helping an employer conceal a double-breasting arrangement. And this court said in LaBarbera, in as many words, that that concealing, the fraudulent concealing of the obligation to pay union benefits, affects an asset of the fund, the asset being the contractual right to collect the benefits. And Halpin, the issue was, are the unpaid funds themselves an asset of the unions? Meaning that, I guess in Halpin the issue was, does the bankruptcy trustee have to give those assets, the unpaid funds, back to the union? And there the Second Circuit said, no, the unpaid funds are not an asset. However, it said the fund, the union benefit fund, does have this contractual right to collect. That is the asset. And so it harmonizes or reconciles LaBarbera with Halpin. And not that there's a reliance interest, but again, the indictment was crafted based on the language from LaBarbera. All right. Thank you. Thank you, Your Honors. I just want to make two quick points. First of all, with regard to counsel's argument that Mr. O'Sullivan initiated the scheme, I think what's missing there is that the purpose of Allied was for non-union work, and although government counsel states that the evidence in the record shows that a lot of the employee witnesses testified they were doing covered work, I would urge the Court to scrutinize the record. It's simply not borne out by the record. And indeed, just to give one example, it's telling that at sentencing as to Mr. Santana, the government effectively conceded that 90% of that employee witness's work was not covered. Second, I just want to quickly address the related companies and Judge Lynch's questions about those. I think it's important to emphasize that there was actually no showing that there was covered work being done. There was an insufficient foundation. And to just – first of all, the civil case didn't find that Navalis owed benefits for all of the work, nothing close. And indeed, the government put in – The civil case isn't the issue, right? Because the civil case – there was no evidence offered to the jury that there were findings in a civil case, right? No, I understand, Your Honor. Let me just give a specific example in terms of the evidence in the criminal case. The government argued in the criminal case that F. Fitzgerald Electric Company was an affiliated company that was used to dodge the obligation to pay benefits when, in fact, that entity, which, by the way, wasn't in the civil case, didn't – Navalis didn't even have a CBA with that union. It's not a victim. And so there were no real grounds to introduce this evidence at all. And that's our point in regard to the 404B. Well, part of the problem here is that this was a kind of compromise ruling, right, where, as the judge later suggested, this may have been unfair to the government in that they weren't allowed to prove all that because the 404B evidence was so restricted as to what they were allowed to say. Well, but the point is that the district court had to comply with 404B. It had to find a sufficient foundation in the first place. And it never did that. And the evidence was confusing. And with regard – that's why she kept it out. The district court kept it out in the first place. And so even – But the problem is that then the defense wanted to put in evidence that said, oh, we pay a lot of money to the unions. So there's a question of does that give a certain misleading impression when, in fact, Allied is just one of several situations of this type? Well, I think that it's – the latter part is not true and a finding wasn't made. And even this notion of door opening isn't really the right way to look at this because even if the door is opened, the evidence still has to comply with 404B and the judge has to make the requisite findings. And we submit that the district court did not. I see that. Thank you. All right. Thank you. Just very briefly because Mr. Naughton's name did not come up but once during my adversary's presentation, I think. But just to come back to a question that Judge Lynch asked about the sort of walking-by-the-bank hypothetical in terms of magnitude of the amount paid versus the amount supposedly avoided, from Mr. Naughton's perspective, I want to point out that the two names that were mentioned by my adversary were Michael Hope and Julio Pomponio. And I can point the court to page 18 of my opening brief in which we note that Mr. Pomponio told the jury that in 2012, Allied had paid him a total of $1,000 for eight hours of work at a public school, whereas he had worked thousands of hours for Nablus for which $160,000 was paid to the cement mason's union's benefit fund. And similar with Michael Hope who testified that he had only did some limited plastering work on and off in early 2014 for which he had been paid by Allied. My point is not to take on the entire burden of saying whether this was or wasn't covered work, but simply to point out that from Mr. Naughton's perspective and what his intent would have been in presenting the evidence to the auditors that you had asked about, that there's a degree of magnitude here that I think is important to see. And also just one final point to reiterate that the 404B evidence, again, that does not apply to Mr. Naughton and it was powerful evidence and it was argued that the defendants, plural, lined their pockets. This is their M.O. and that's certainly not true for Mr. Naughton. All right, thank you. I'd like to offer two minutes of final comments on conscious avoidance. Both in global tech from the Supreme Court requires deliberate action to avoid knowledge and this court has used similar formulations in its cases and it's even cited global tech. And I want to urge the court not to adopt a rule, which I think it would have to do in this case to find the instruction appropriate, that elevates deliberate inaction to equal deliberate action, which is what the Supreme Court requires to avoid knowledge, and then permits deliberateness to be inferred from evidence of actual knowledge and then also permits inaction to be inferred from evidence of actual knowledge. If that's the rule, then in any case where knowledge is disputed, the conscious avoidance instruction is going to be given. And so we will have moved from that beginning point I talked about at the beginning of my argument where courts worried about the dangers of the conscious avoidance instruction and cautioned that it should rarely be given. We will have moved to a situation where it's always given. In every case it's permissible to give as long as knowledge is an element and is disputed. I urge the court not to go that far. Last point I want to make. Your Honor asked me about... Why is that? Why would that be a bad thing? Because why isn't conscious avoidance just another way of saying knowledge? That there are things I cannot deny that I know when I know enough that the only way I can say I don't know is by a sort of feigning that nobody told me that this is true. I didn't do the scientific test or something of that kind. Why is conscious avoidance not just what we mean when we say that somebody knew something? Because they didn't know it. I mean, at the most sort of literal level, conscious avoidance means the person didn't know the fact. And then the question is, should we treat that ignorance as equivalent to knowledge? And the Supreme Court in global tech set out, and this court as well, has set out fairly strict limits on when that can happen, when you can permissibly draw that inference. Why is it dangerous to include the conscious avoidance instruction? Because even with the caution the judge gave and is routinely given that negligence isn't enough and foolishness isn't enough, there is a danger that conscious avoidance is going to slide into negligence, recklessness, and so on. So the instruction should not be given in every case where knowledge is disputed. And yet, if it can be given here, then it can be given in every case. May I make one final point that will take about 30 seconds? Your Honor, you asked me about overwhelming evidence. And I simply want to point to the legal standard, which is harmless beyond a reasonable doubt. So if you take harmless beyond a reasonable doubt, overwhelming evidence is what makes an error in giving a conscious avoidance instruction harmless beyond a reasonable doubt. So it's got to be pretty certain that the defendant had the actual knowledge. Thank you. Thank you to all of you. We will take the case under advisement.